UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                :

MADRYN ASSET MANAGEMENT, LP,        :
                                                :
                       Petitioner,          :
                                                :

                -v-                            :              23 Civ. 3704 (JPC)
                                                    :
TRAILMARK INC,                              :       OPINION AND
                                                    :         ORDER
                       Respondent.         :
                                                    :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Petitioner Madryn Asset Management, LP ("Madryn") has petitioned to vacate an interim arbitration award on liability issued in favor of Respondent Trailmark, Inc. ("Trailmark"). Finding that the Court has jurisdiction to review the interim award and that there are no grounds to modify or vacate it, the Court denies the petition.

## I. Background

### A.      Underlying Facts[1]

       Madryn, an asset manager that creates and manages private funds for investors, was formed as a spin-out from now-defunct Visium Fund Management, LLC ("Visium"). Interim Award at 1-2; Petition at 2. In 2014, Visium retained Trailmark, a registered broker-dealer that acts as a placement agent, to help raise what would later become Madryn's first fund, Madryn Health

---

[1] The following facts are drawn from the subject advisory agreement, Dkt 17-1 ("Agreement"), the arbitrator's Interim Award, Dkt. 17-26 ("Interim Award"), and the parties' submissions—which include Madryn's petition to vacate the arbitrator's award, Dkt. 3 ("Petition"), Trailmark's opposition, Dkt. 21 ("Opposition"), Madryn's Reply, Dkt. 24 ("Reply"), and exhibits attached to their attorneys' declarations, Dkts. 22 ("Miodonka Declaration"); 25 ("Bolla Declaration").

Partners, L.P. ("MHP").  Interim Award at 1; Petition at 2-3.  After Visium's collapse, Madryn assumed management responsibilities over MHP.  Interim Award at 4; Petition at 2.

At the time of the spin-out, Visium owed Trailmark placement agent fees and sought to have that obligation assumed by Madryn with a release from Trailmark.  Interim Award at 4.  That release gave Trailmark substantial leverage over Madryn—which needed Trailmark to continue as a placement agent on MHP—as to the timing and terms of a new advisory agreement between them.  *Id*.  For instance, while Madryn preferred to push off the negotiation until after the spin-out, the Agreement was ultimately executed as part of the spin-out process, pursuant to Trailmark's insistence.  *Id.* at 5 n.4.  During the negotiations, Trailmark proposed serving as Madryn's exclusive placement agent for three Madryn "Health Partner" funds with the same compensation model for the first and second funds.  *Id.* at 5.  Trailmark further proposed that it earn fees for its services on the second fund based on funds raised from investors that participated in the first fund. *Id.*  Despite Madryn's objection particularly to the latter proposal, the parties included these terms in the Agreement, which was executed on January 21, 2017.  *Id.* at 5-6.

Under the precise terms of the Agreement, Trailmark was to be the exclusive placement agent for MHP and any parallel or feeder vehicles (collectively defined as the "Fund"), with the parties' mutual obligations as to MHP further extending to both "Fund II" and "Fund III."  *Id.* at 6; *see also* Agreement § 1.  Under Section 9(a) of the Agreement, "Fund II" and "Fund III" are defined as "the first two funds following the Fund that will be expected to invest more than 75% of their capital pursuant to the Madryn Strategy," which is, in turn, defined to include "investments in debt instruments, royalty interests, revenue interests, [etc.] . . . relating to pharmaceutical and healthcare companies, institutions or inventors."  Petition at 3 (citing Agreement § 9(a)(viii), (ix)). And pursuant to Section 9(m), Trailmark has the right to deem any "Off-Strategy Fund"—that is,

2

a fund following the Fund or Fund II that is *not* expected to invest more than 75% of its capital pursuant to the Madryn Strategy—as "Fund II" or "Fund III" within thirty days of notice by Madryn of its intent to raise such a fund.  *Id.* at 4 (citing Agreement § 9(m)).  That subsection concludes:

> For the avoidance of doubt, any fund raised by Madryn following the Fund or Fund II, as applicable, that is expected to invest more than 75% of its capital pursuant to the Madryn Strategy, shall automatically be considered to be Fund II or Fund III, as applicable, subject to [Trailmark]'s ability to elect to cause an Off-Strategy Fund to be considered Fund II or Fund III, as applicable, for purposes of this Agreement.

*Id.* (citing Agreement § 9(m)).  As for compensation, the Agreement entitles Trailmark to placement fees that are calculated based on the commitments made by investors to the funds, as well as fixed advisory fees.  *See* Interim Award at 8 (discussing Agreement §§ 9(d), (e), and (i)).  At the same time, the Agreement gives Madryn a "Fund III Limited Scope Right" to limit Trailmark's right to commissions on those investors in Fund III who directly or through their advisors had previously taken meetings or substantive telephone calls with Madryn and may or may not have invested in Fund II but had not invested in Fund I.  *Id.* (discussing Agreement § 2).

MHP closed in December 2019 after it raised roughly $400 million.  *Id.* at 9.  Both Madryn and Trailmark expected that MHP would be followed by progressively larger successor funds, as that was the standard practice in the industry.  *Id.*  Indeed, Madryn projected an initial target of between $500 million and $600 million in assets under management for the next fund, Fund II.  *Id.*; *see* Opposition at 5.  The parties further expected that Fund II would be MHP II, as evidenced by Madryn's corporate officers' consistent reference to MHP II as "Fund II" in internal emails.  Interim Award at 9 n.8, 28-30.

Madryn began its preliminary work on MHP II in late 2019, even before the close of MHP, *Id.* at 9.  Madryn hid this from Trailmark, however, as Madryn intended to replace Trailmark with

Trailmark's competitor, Campbell Lutyens & Co. ("CL"), and to negotiate a buyout of Trailmark. *Id.* at 10.  From October 2019 until May 2021, Madryn met with CL roughly 20 times.  *Id.*; *see also* Petition at 6 ("Madryn also internally considered retaining another placement agent—meeting with another candidate numerous times").  Madryn took active measures to conceal these meetings from Trailmark, including by using encrypted emails.  Interim Award at 10.  In May 2020, Madryn and CL agreed in principle to terms for Madryn to retain CL as the placement agent for MHP II, and exchanged drafts of an engagement letter over the next two months.  *Id.* at 11-12.  But these discussions ultimately came to a halt.  *Id.*

In February 2021, Madryn reached out to Trailmark about "Fund II," seeking to renegotiate the placement fee terms of the Agreement.  *Id.* at 12; Petition at 6.  Madryn explained that it could no longer afford Trailmark's fees due to a change in its investor fee model, but when Trailmark asked twice in March 2021 to see Madryn's financial models, Madryn failed to respond.  Interim Award as 12-13.  Instead, in May 2021, Madryn admitted that it did not want to work with Trailmark on MHP II and offered to buy Trailmark out of the Agreement.  *Id.* at 13.  Trailmark made a counteroffer, and Madryn—believing that the size of the counteroffer indicated that Trailmark was simply unwilling to engage in such discussions—ignored it.  *Id.*  Meanwhile, Madryn resumed its work on MHP II.  *Id.* at 13.  And from March 2021 to July 2021, Madryn continued to discuss MHP II with investors, continued to refer to MHP II as "Fund II" internally, and continued to interview placement agents to replace Trailmark.  *Id.* at 13-14.

Trailmark next heard from Madryn on July 8, 2021, when Madryn sent Trailmark an email with the "exciting news" that it would be raising "Fund II."  *Id.* at 17.  Much to Trailmark's surprise, Madryn was referring not to MHP II, but rather to Madryn Select Opportunities LP ("MSO").  *Id.*  According to Madryn, although it had hoped to launch MHP II as the next fund,

"the Covid-19 pandemic and the departure of a founding partner caused some changes and temporary upheaval and resulted in a 'tepid' response from MHP investors," leading to the change of plans involving the launch of MSO, which "could be implemented more quickly than MHP II and would benefit MHP investors by infusing capital into MHP portfolio companies and giving a new team member time to integrate." Petition at 5-6. When Madryn offered MSO to Trailmark as "Fund II," MSO comprised a single $5 million investment. Interim Award at 17. MSO was ultimately capped at $100 million. *Id.* at 18-19; *see* Opposition at 7. Madryn alleged that it was advised by its counsel that it was required under the Agreement to present MSO to Trailmark as "Fund II." Interim Award at 18; Petition at 6. The Arbitrator declined to credit that allegation. *See* Interim Award at 31.

Trailmark believed that the presentment of MSO as "Fund II" was Madryn's latest attempt to shirk its obligations under the Agreement, given the difference in anticipated placement fees of $7 million from work on MHP II and $1.5 million from work on MSO. *Id.* at 18-19; *see also* Opposition at 8. Trailmark further believed that, given Madryn's Fund III Limited Scope Right in the Agreement, Trailmark would lose its exclusive right to raise MHP II if it accepted MSO as "Fund II." Interim Award at 19. In August 2021, Trailmark expressed its view that MSO was not designated properly as "Fund II" under the Agreement, but Madryn responded that it was "not amenable to considering it otherwise." *Id.*

## B. Arbitration

A few days later, on August 26, 2021, Trailmark commenced the underlying arbitration, alleging that Madryn breached the implied covenant of good faith and fair dealing by "improperly depriv[ing] [it] of fees it was entitled to under the Agreement." Interim Award at 2. On October 4, 2021, Madryn answered and asserted a counterclaim for breach of contract against Trailmark

for Trailmark's purported repudiation of the Agreement.  *Id.*  While discovery was underway, the parties agreed to bifurcate the issues of liability and damages.  Opposition at 9.  Following discovery, the parties then proceeded to a hearing on liability before the Honorable Theodore H. Katz, a former United States Magistrate Judge in this District (the "Arbitrator").  *Id.*  In October 2022, the Arbitrator conducted a five-day evidentiary hearing.  Interim Award at 3.

Meanwhile, in November 2021, Madryn retained Trailmark's competitor, Lazard, as the placement agent for MHP II with Lazard's compensation terms carving out all MHP I investors. Interim Award at 20, 33.  In December 2021, Madryn and Lazard agreed to amend the agreement to include work on MSO.  *Id.* at 20.  None of the original MHP I investors invested in MSO.  *Id.*

In February 2023, the Arbitrator issued an Interim Award on the issue of liability.  Petition at 1.  The Arbitrator found Madryn liable for breach of the implied covenant of good faith and fair dealing and dismissed Madryn's counterclaim.  Interim Award at 27, 33-34, 37; Opposition at 9.

Specifically, the Arbitrator found that Madryn's insistence that Trailmark accept MSO—in a context where "both parties had long expected MHP II to be Madryn's next fund," where Madryn had nonetheless repeatedly attempted to replace Trailmark as the placement agent for MHP II,  and where Madryn was at the same time actively concealing its work on MHP II from Trailmark (Madryn's exclusive placement agent), Interim Award at 24—"violated the covenant because it was part of a bad faith scheme to deny Trailmark its bargained for placement fee."  *Id.* at 27.  The Arbitrator thereafter dismissed Madryn's counterclaim that Trailmark repudiated the Agreement (by refusing to accept MSO as Fund II), reasoning that Madryn's prior breach of the implied covenant of good faith and fair dealing excused Trailmark's subsequent nonperformance. *Id.* at 37.

C.    **Procedural History**

On May 4, 2023, Madryn petitioned this Court to vacate the Interim Award,  Dkt. 1, and at the same time moved to stay the damages phase of the arbitration pending this Court's decision on the petition, *see* Miodonka Declaration, Exh. 1 ("Arbitrator's June 16, 2023 Order") at 1-2.

On June 16, 2023, in rejecting Madryn's request for a stay, the Arbitrator raised the issue of whether the Interim Award was sufficiently final to support jurisdiction in the district court.  *Id.* at 3-4.  On June 28, 2023, Madryn submitted a letter to the Arbitrator in support of its position that the Award was final and appealable.  *See* Bolla Declaration, Exh. A.  The Arbitrator expressed his intent to defer to this Court's decision on the finality of the award for purposes of 9 U.S.C. § 10.  *Id.*, Exh. B (Arbitrator's July 7, 2023 Order) at 2.

On July 17, 2023, Trailmark opposed Madryn's petition.  Dkt.  21.  On August 4, 2023, Madryn replied, *see* Dkt. 24 ("Reply), and requested oral argument, Dkt. 26.

## II.  Legal Standard

When reviewing an arbitration award under the Federal Arbitration Act ("FAA"), 9 U.S.C § 1 *et seq.*, a court "can confirm and/or vacate the award, either in whole or in part."  *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006)).  "[A]rbitral awards and the arbitral process" deserve "strong deference."  *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007).

"Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'"  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).  The FAA sets out four explicit grounds to vacate an arbitration award: (1) "the award was procured by corruption, fraud, or undue means,"

(2) the arbitrators showed "evident partiality or corruption," (3) "the arbitrators were guilty of misconduct" that prejudiced "the rights of any party," or (4) "the arbitrators exceeded their powers." 9 U.S.C. § 10(a).  Besides these four explicit bases, the Second Circuit has put a "judicial gloss on the specific grounds for vacatur of arbitration awards" in the FAA and recognized that a "court may set aside an arbitration award if it was rendered in manifest disregard of the law." *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011) (cleaned up); *accord Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021).

These stringent standards mean that a petitioner "must clear a high hurdle" to vacate an arbitration award.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).  A petition to vacate an arbitration award is "not an occasion for *de novo* review of an arbitral award." *Scandinavian Reinsurance Co.*, 668 F.3d at 71 (quotations omitted).  Instead, the review is "severely limited so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Id.* at 71-72 (quotations omitted).

### III.  Discussion

#### A.    Subject Matter Jurisdiction

In opposing the petition to vacate, Trailmark argues that the Court lacks subject matter jurisdiction to review the Interim Award.  Opposition at 12-13.  Trailmark's argument rests on the Arbitrator's conclusion that the Award was not final or partially final.  *Id.*  Because this Court must assure itself of its jurisdiction before proceeding to the merits, it begins with the question of whether subject matter jurisdiction exists.  *See Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) (explaining that federal courts "have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*").

Generally, for an award to be final, "the arbitrators must have decided not only the issue of liability of a party on the claim, but also the issue of damages." *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980). An exception to this general rule applies, however, when the parties expressly agree to bifurcate the issues of liability and damages. *Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991). When the parties agree that the arbitration panel is to make a final decision as to part of the issues, "the arbitrators have authority and responsibility to do so," and the decision will be a "final partial award." *Id.*

As Trailmark acknowledges, the parties agreed to bifurcate liability and damages. *See* Opposition at 9; *see also* Arbitrator's June 16, 2023 Order (the Arbitrator confirming that the parties bifurcated the issues of liability and damages). *Trade & Transport* is instructive, if not dispositive. There, the parties asked the panel to decide the issue of liability immediately, resulting in a bifurcated decision. 931 F.2d at 195. The Second Circuit held that the panel's award was a final decision on the issue of liability. *Id.* Because the parties had asked the arbitrators to make a final decision about part of the dispute and the panel had done so, the arbitrators had no further authority to redetermine that issue. *Id.* Subsequent cases have confirmed this exception when the parties expressly agreed to bifurcate liability and damages. For example, in *Global Gold Mining LLC v. Caldera Resources*, the court held that because the parties expressly agreed to decide liability first and leave the issue of damages for a later date, the exception to the general rule applied and the decision on liability was final and reviewable. 941 F. Supp. 2d 374, 382-83 (S.D.N.Y. 2013); *see also Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) (explaining that arbitration decisions that "conclusively dispose[] of a separate and independent claim" may be reviewed as final determinations "although [they do] not dispose of all the claims that were submitted to arbitration" (citations omitted)).

Because the parties expressly agreed to bifurcate liability and damages, and because the Interim Award was consistent with that agreement by fully deciding liability first, the Court has subject matter jurisdiction to review the Interim Award.

## B.    Petition to Vacate

The Court next turns to the merits of Madryn's petition.  In seeking vacatur of the Interim Award, Madryn argues that the Arbitrator manifestly disregarded the law.

### 1.    Relevant Legal Principles

As an initial matter, the Court's review "under the doctrine of manifest disregard is severely limited." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003) (internal quotation marks omitted).  Vacatur of an arbitration award on this ground requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law."  *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002).  Indeed, a reviewing court is compelled to enforce an arbitration award, "despite [the] court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached."  *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (internal quotation marks omitted).

Under this exacting standard, a petitioner "seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent."  *Seneca Nation of Indians*, 988 F.3d at 625-26 (internal quotation marks omitted).  Accordingly, "to succeed in challenging an award under the manifest disregard standard," the petitioner must show "that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and

nonetheless willfully flouted the governing law by refusing to apply it." *Id.* at 626 (internal quotation marks and citation omitted). "In addition to this 'subjective component,' a finding of manifest disregard requires an objective determination that the disregarded legal principle was 'well defined, explicit, and clearly applicable.'" *Id.* (quoting *Westerbeke*, 304 F.3d at 209). Here, the parties do not dispute the clarity of the general principles governing the implied covenant of good faith and fair dealing, which principles the Court briefly sets forth.

Under New York law, a covenant of good faith and fair dealing is implied in all contracts. *See Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (internal quotation marks omitted). While "[i]n most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative . . . in some cases a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) (internal quotation marks omitted). Accordingly, "[a] claim for breach of the covenant may be brought . . . only where one party's conduct, *though not breaching the terms of the contract in a technical sense*, nonetheless deprived the other party of the benefit of its bargain." *Id.* (internal quotation marks omitted and emphasis added). For instance, "[w]here the contract contemplates the exercise of discretion," the covenant of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)).

But the covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (internal quotation marks omitted). Nor does it "add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (internal quotation marks omitted). Rather, "[t]he implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract." *Id.* (internal quotation marks omitted).

Indeed, a party "violates the covenant of good faith and fair dealing only when he acts with some improper motive." *Wagner v. JP Morgan Chase Bank*, No. 06 Civ 3126 (RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (internal quotation marks omitted). Accordingly, "[i]n determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." *Tractebel Energy Mktg., Inc., v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (internal quotation marks omitted). "[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact . . . ." *Id.* (internal quotation marks omitted).

## 2.    Analysis

Madryn argues that the Arbitrator manifestly disregarded the law by considering extrinsic evidence to determine the parties' reasonable expectations under the Agreement, Petition at 19-22; issuing a ruling in direct conflict with the express and purportedly unambiguous terms of the Agreement, *id.* at 17-19, engrafting extra-contractual rights onto the Agreement, *id.* at 12-17; and

contradicting his own finding that Madryn had a "legitimate business reason" to raise MSO, *id.* at 12-13.  The Court disagrees.

Madryn urges that the Arbitrator—in relying on extrinsic evidence to conclude that Trailmark reasonably expected "Fund II" to be MHP II, *see, e.g.*, Interim Award at 9 n.8 (the Arbitrator describing testimony in support of the parties' expectations)—manifestly disregarded the well-settled doctrine of contract interpretation proscribing the consideration of extrinsic evidence where an agreement's terms are facially unambiguous.  Petition at 20 (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000)).[2]  That doctrine certainly applies to ordinary breach of contract claims.  But to determine whether a party has violated the implied covenant of good faith and fair dealing, an adjudicator necessarily looks outside the four corners of a contract, irrespective of any ambiguities purportedly contained therein, to assess "any course of performance or course of dealing that may exist between the parties."  *Parneros v. Barnes & Noble, Inc.*, No. 18 Civ. 7834 (MKV), 2020 WL 5350531, at *7 (S.D.N.Y. Sept. 3, 2020) ("Whether a party has breached the covenant depends on *not only the express language of the parties' contract*,

---

[2] Madryn seems to take for granted the facial unambiguity of the Agreement's terms.  To be sure, the Arbitrator found, and Trailmark admitted, that MSO technically meets the definition of Fund II set forth in Section 9(m).  In considering the Agreement's use of term "Fund II," however, the Arbitrator additionally looked to the compensation provision in Section 9(d) "that gave Trailmark the right to earn fees on re-up investors in Fund II."  *See* Interim Award at 26.  The Arbitrator noted that "if MSO"—which "was not targeted to MHP I investors" and in fact "was most appealing to investors not already in MHP I"—was considered be "Fund II," it would render meaningless" the compensation provision in the Agreement.  *Id.*  In these circumstances, the Arbitrator had at least a "barely colorable justification"—under traditional contract interpretation principles even outside the implied covenant context—to conclude that the parties intended "Fund II" to refer specifically to MHP II, which Madryn does not appear to dispute likewise meets the definition of "Fund II" under the definition provided in Section 9(m).  *See, e.g., LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (explaining that under New York law a contract "should be construed so as to give full meaning to all of its provisions" such that an "interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . will be avoided if possible" (internal quotation marks and citations omitted)).

but also any course of performance or course of dealing that may exist between the parties." (emphasis added) (quoting *Tractebel Energy Mktg.*, 487 F.3d at 98)); *see also Tractebel Energy Mktg.*, 487 F.3d at 98 (explaining that "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case") (internal quotation marks omitted)).  The Arbitrator did not manifestly disregard the law by relying on extrinsic evidence in these circumstances.

Madryn additionally contends that the Arbitrator "create[d] an impossible conflict" between Madryn's purported obligations under the Agreement and Madryn's compliance with the Arbitrator's delineation of Madryn's obligations under the implied covenant.  Petition at 12.  In so arguing, Madryn refers to the principle that "the implied covenant cannot be used to create independent obligations beyond the contract."  *Id.* at 11 (quoting *19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 438 (S.D.N.Y. 2015)).  Specifically, Madryn insists that because it was *required* to bring MSO to Trailmark as "Fund II" under the Agreement, the Arbitrator's purported fabrication of an obligation under the covenant for Madryn to "forego or postpone" MSO was in manifest disregard of the law:

> On one hand, Madryn was contractually obligated to treat MSO as Fund II under the Agreement, and to seek Trailmark's assistance in raising Fund II.  Had Madryn not done so, Trailmark could have sued for breach of the express terms of the Agreement.  On the other hand, according to the Liability Award, Madryn treating MSO as Fund II was a breach of the implied covenant.  Accordingly, the only safe path for Madryn would have been to forego or postpone MSO (or alternatively prematurely launch MHPII before it was even legally created), to attempt to ensure that Trailmark earned its desired fees on a hopefully larger fund—which would be nothing less than an unprecedented act of commercial philanthropy (if not a violation of Madryn's duties to its investors).

14

*Id.* at 12-13.[3]   Madryn's contention is premised on a misconstruction of the Arbitrator's decision. Madryn suggests that its violative conduct, as determined by the Arbitrator, consisted exclusively of its decision to present MSO as Fund II to Trailmark.   *See, e.g.*, Petition at 8 ("The Arbitrator then found that Madryn breached the implied covenant of good faith and fair dealing by presenting MSO to Trailmark as Fund II . . . .").   But Madryn elides its active concealment of the preliminary work it undertook with respect to MHP II—the very conduct on which the Arbitrator's determination hinged.

In finding that Madryn breached the implied covenant of good faith and fair dealing, the Arbitrator did not consider Madryn's treatment of MSO as "Fund II" *in isolation*—as Madryn portrays it.   Rather, the Arbitrator assessed Madryn's insistence that Trailmark work on MSO as Fund II specifically

> in a context where (1) both parties had long expected MHP II to be Madryn's next fund; (2) Madryn attempted over a number of years to replace Trailmark as placement agent, primarily because it viewed the compensation provisions of the Agreement as too favorable to Trailmark; and (3) at the time Madryn insisted that Trailmark work on MSO as Fund II under the Agreement, Madryn was working on preparations to launch MHP II, without informing Trailmark, it exclusive placement agent.

Interim Award at 24.   In other words, the Arbitrator found Madryn in breach of the implied covenant because Madryn's scheme—which included Madryn's concealment of its preliminary

---

[3] The Court notes that it is far from clear whether Madryn was contractually obligated to insist that Trailmark work on MSO as "Fund II."   *Cf. supra* n.2.   Madryn again contends—as it did before the Arbitrator—that it "confirm[ed] with counsel that it was required" to just treat MSO as "Fund II" under the Agreement.   Petition at 12.   But the Arbitrator declined to credit the witness testimony that Madryn offered with respect to its purported receipt of such legal advice, noting that "the documentary evidence does not confirm this testimony" and that "Madryn's attorneys shed no light on these issues because they did not testify at the Hearing."   Interim Award at 21. The Court is in no position to revisit the Arbitrator's factual determination here.   *See Westerbeke*, 304 F.3d at 214 (explaining that an arbitrator's factual findings "are not subject to judicial challenge" on a court's "limited review of whether the arbitrator manifestly disregarded the law").

work on MHP II and its attempts to replace Trailmark as the placement agent on MHP II—frustrated Trailmark's reasonable expectations under the Agreement that Trailmark would serve as the exclusive placement for MHP II.  *See, e.g.*, *id.* at 24, (the Arbitrator finding that "[a]s a threshold matter, Trailmark's expectation that MHP II would be Fund II was eminently reasonable"), 27 (the Arbitrator explaining that "Madryn's insistence that Trailmark accept MSO as Fund II violated the covenant of good faith and fair dealing because it was part of a bad faith scheme to deny Trailmark its bargained for placement fees").  Accordingly, the relevant good faith obligation imposed on Madryn under the implied covenant was *not* the obligation to "forego or postpone MSO," as Madryn frames it, *see* Petition at 13, but rather the obligation to allow Trailmark to work on MHP II.[4]  As the Arbitrator explained, that latter obligation is entirely *consistent* with the terms in the contract:

> The fact that the Parties' Agreement defined "Fund II" broadly enough to include MSO and/or that Section 9(m) deems the first two funds following MHP to be Fund II and Fund III, does not preclude the conclusion that Madryn's insistence that Trailmark accept MSO as Fund II violated the [implied covenant].  [Madryn] has not shown how *allowing Trailmark to work on MHP II*—work that was contemplated under the Agreement and that had been underway—while giving it the option of working on MSO, adds to, negates, or is inconsistent with the terms in the Agreement.

Interim Award at 33-34 (emphasis added).  The Arbitrator thus did not flout the law's prohibition on imposing obligations that contradict a contract's express terms.

---

[4] Madryn also argues in passing that "Section 2(a) plainly provides that Trailmark would only provide assistance on drafting new documents, 'as requested by Madryn,'" and that "[t]here is no indication that the Arbitrator considered the contract in that portion of his analysis, which is devoid of any mention of Section 2(a) or its practical effect."  Petition at 15-16.  To the extent Madryn is arguing that the Arbitrator erred in determining that Madryn was *required* under the contract to allow Trailmark to assist in the preliminary work for MHP II, the Arbitrator never made such a determination.  Rather, as Trailmark notes, the Arbitrator concluded that "Madryn's secret preparation of these MHP II materials without Trailmark's assistance while insisting that it was not raising another fund was contrary to the parties' course of dealing and additional evidence of Madryn's bad faith."  Opposition at 23 n.12 (discussing Interim Award at 27-30).

In a similar vein, Madryn further contends that the Arbitrator's ruling vested Trailmark with the "right to simply pass on MSO and wait for a more lucrative opportunity." Petition at 12. That argument also fails for its reliance on the same misrepresentation of the Arbitrator's decision. Once again, the Arbitrator determined that Trailmark reasonably expected that Fund II would be MHP II under the terms of the Agreement, found that Madryn actively worked to frustrate those reasonable expectations, and thereby held that Madryn breached the implied covenant. The Arbitrator simply did not hold—in effect or otherwise—that Madryn violated a fabricated right on Trailmark's part to refuse MSO. As Trailmark explains, Madryn "conflates the good-faith limitation imposed by law on Madryn's discretion over the funds with a supposed attempt to re-write the Agreement." Opposition at 20.

Lastly, Madryn contends that the Arbitrator's finding that Madryn had a legitimate business purpose for raising MSO conflicts with his finding that Madryn violated the implied covenant. Petition at 13-14; *see id.* at 13 (explaining that "actions are deemed reasonable—and not arbitrary or irrational—where they are driven by legitimate business purposes" and citing *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004)). Madryn does not explain how its legitimate reason for raising MSO absolves it for conduct that entailed actively concealing its work on MHP II from Trailmark and persistently attempting to replace Trailmark as the placement agent on MHP II. And there is, of course, a significant difference between whether Madryn had a legitimate purpose in engaging in such conduct and whether Madryn had a legitimate purpose in raising MSO. The Arbitrator did not manifestly disregard any clear legal principles in concluding that Madryn had a legitimate purpose in raising MSO, while at the same time finding that Madryn violated the implied covenant.

17

In sum, Madryn has failed sustain its heavy burden of demonstrating that the Arbitrator, in a demonstration of "egregious impropriety," "willfully flouted the governing law by refusing to apply it." *Seneca Nation of Indians*, 988 F.3d at 626.

## IV.    Conclusion

For all the reasons given, the Court denies Madryn's petition to vacate the Interim Award. Madryn's request for oral argument is denied as moot.  Dkt. 26.  The Clerk of the Court is respectfully directed to close the motion pending at Docket Number 7.  The parties shall file a joint letter no later than April 5, 2024, advising the Court of their respective views as to whether this case should be terminated.

SO ORDERED.

Dated: March 30, 2024
       New York, New York

JOHN P. CRONAN
United States District Judge

18